**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**
No. 93-2267

In re: Bruce Young; In re: Nancy Young, *
                                         *
                                         *
_____         *
                                         *
Julia A. Christians,                     *
                                         *
          Appellee,                      *
                                         *  Appeal   from   the   United
States                                   *
     v.                                  *  District Court for the
                                         *  District of Minnesota.
Crystal Evangelical Free Church,                                      *
                                         *
          Appellant.                     *
_____         *
                                         *
United States of America,                *
                                         *
          Intervenor on Appeal,                                       *
                                         *
Christian Legal Society; The National                                *

Association of Evangelicals; Americans                               *
United for Separation of Church and                                  *
State; Concerned Women for America;                                  *
The Baptist Joint Committee on Public                                *
Affairs; The Southern Baptist *
Convention; The General Conference of                                *
Seventh-Day Adventists; The Evangelical*
Lutheran Church in America,    *
                                         *
          Amici Curiae.        *
                                         *

United States Senator Orrin G. Hatch;        *
The Church of Jesus Christ of Latter-        *
Day Saints; Catholic League for          *
Religious and Civil Rights; Traditional     *
Values Coalition; Worldwide Church of     *
God,                   *
                   *
     Amicus Curiae.    *
                   *
Coalition for the Free Exercise of       *
Religion,              *
                   *
     Amicus on Behalf of Appellant.      *
              _____

         Submitted:  December 8, 1997
                       Filed:   April 13,
1998
              _____

Before McMILLIAN and MAGILL, Circuit Judges, and BOGUE,<sup>*</sup>
    District Judge.
              _____

MAGILL, Circuit Judge.

    In our earlier opinion in this matter we reversed the district court and held that under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb to 2000bb-4, bankruptcy debtors' religious tithes could not be recovered from a church as avoidable transactions in adversary proceedings. <u>See</u> <u>Christians v. Crystal Evangelical Free Church (In re Young)</u>, 82 F.3d 1407, 1420 (8th Cir. 1996). In <u>City of Boerne v. Flores</u>, 117 S. Ct. 2157 (1997), the Supreme Court held that RFRA was unconstitutional as applied to <u>state law</u> because Congress

---

     <sup>*</sup>THE HONORABLE ANDREW W. BOGUE, United States District Judge for the District of South Dakota, sitting by designation.

had exceeded its enforcement powers under § 5 of the Fourteenth Amendment. The Supreme Court subsequently

summarily vacated and remanded our decision in <u>Christians</u> for reconsideration in light of <u>Flores</u>. <u>See</u> <u>Christians v. Crystal Evangelical Free Church</u>, 117 S. Ct. 2502, 2502 (1997). Upon reconsideration, we conclude that, under the Bankruptcy Clause and the Necessary and Proper Clause of Article I of the Constitution, RFRA is constitutional as applied to <u>federal law</u>. Accordingly, we reinstate our previous decision, and again reverse the district court.

**I.**

Bruce and Nancy Young are active members of the Crystal Evangelical Free Church (the Church). In accordance with their religious beliefs, the Youngs tithed ten percent of their annual income to the Church. While the Church teaches that its members should contribute to support the Church, it does not require payment for attendance or membership, and would provide all services to the Youngs regardless of the amount of their tithes. Between February 1991 and February 1992, the Youngs tithed $13,450.00 to the Church.

The Youngs filed a joint Chapter 7 bankruptcy petition in February 1992. Because the Youngs had been insolvent during the previous year, bankruptcy trustee Julia Christians (the Trustee) sought to avoid the Youngs' tithes to the Church as fraudulent transfers under 11 U.S.C. § 548(a)(2)(A). Both the bankruptcy court and the district court held that the tithes to the church were avoidable transactions, and allowed the Trustee to recover the tithes from the Church.

To avoid the Youngs' tithes under 11 U.S.C. § 548(a)(2)(A), the Trustee had the burden of proving that "(1) there was a transfer of the debtors' interest in property (2) made on or within a year preceding the filing of the petition (3) while the debtors were insolvent (4) in exchange for which the debtors received less than reasonably equivalent value."  Christians, 82 F.3d at 1410.  The parties stipulated that the first three factors were present.  See id.  We held that the Trustee had also proven the fourth factor,

because the Church did not premise any of its services on the Youngs' tithes and therefore did not provide anything in exchange for the tithes. See id. at 1415. Accordingly, we held that the Youngs' tithes would ordinarily be avoidable transactions. See id. at 1416.

We also concluded, however, that allowing the Trustee "recovery of the contributions substantially burdens the debtors' free exercise of their religion and is not in furtherance of a compelling governmental interest and therefore violates the RFRA." Id. at 1417. Because "RFRA provides a defense against the order of the district court permitting the trustee to avoid the debtors' contributions to the church," we held that "[t]he trustee is not entitled to recover $13,450 from the church." Id. at 1420.

After this Court denied the Trustee's petition for rehearing en banc, see Christians v. Crystal Evangelical Free Church (In re Young), 89 F.3d 494, 494 (8th Cir. 1996), the Supreme Court held that RFRA was unconstitutional as applied to state law. See Flores, 117 S. Ct. at 2172. Subsequently, the Supreme Court granted certiorari in the instant case, vacated our initial opinion, and remanded for reconsideration in light of Flores. See Christians, 117 S. Ct. at 2502. On remand, the Trustee argues that RFRA is unconstitutional as applied to federal law because Congress violated the separation of powers doctrine in enacting the statute and because RFRA violates the Establishment Clause of the First Amendment.

**II.**

## A. RFRA and Flores

RFRA was enacted as a legislative response to the Supreme Court's decision in <u>Employment Div., Dep't of Human Resources v. Smith</u>, 494 U.S. 872 (1990). In <u>Smith</u>, the Supreme Court held that the First Amendment "right of free exercise [of religion] does not relieve an individual of the obligation to comply with a valid and neutral law

of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." Id. at 879 (quotations omitted). In reaching this holding, the Supreme Court effectively overruled precedent that had provided greater protection to individuals whose religious practices were burdened by the operation of neutral laws. See id. at 883-85 (rejecting rule of Sherbert v. Verner, 374 U.S. 398 (1963), that "governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest").

Congress enacted RFRA to limit the Smith decision's impact on the practice of religious liberties. Congress found that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise," and concluded that "governments should not substantially burden religious exercise without compelling justification." 42 U.S.C. § 2000bb(a)(2) & (3). Congress enacted RFRA "to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened [and] to provide a claim or defense to persons whose religious exercise is substantially burdened by government." 42 U.S.C. § 2000bb(b)(1) & (2).

RFRA codified the compelling interest test of Sherbert and Yoder, and provided that the government could "substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental

interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(b)(1) & (2).  Congress intended RFRA to apply "to all Federal and State law."  42 U.S.C. § 2000bb-3(a); see also 42 U.S.C. § 2000bb-2(1) (defining "government" to include "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, a State, or a subdivision of a State").

Whether Congress has the authority to impose RFRA on state law was soon questioned, see, e.g., Hamilton v. Schriro, 74 F.3d 1545, 1570 (8th Cir.) (McMillian, J., dissenting) ("Because Congress does not have the power under § 5 of the Fourteenth Amendment to enact RFRA, I would hold that the Religious Freedom Restoration Act is unconstitutional."), cert. denied, 117 S. Ct. 193 (1996), and the Supreme Court ultimately declared that this part of RFRA was beyond Congress's power to enact. See Flores, 117 S. Ct. at 2172.

As the Flores Court noted, "Congress relied on its Fourteenth Amendment enforcement power in enacting the most far reaching and substantial of RFRA's provisions, those which impose its requirements on the States." Id. at 2162. The enforcement power of § 5 of the Fourteenth Amendment is remedial and only allows Congress to preserve rights already protected by the Fourteenth Amendment. See id. at 2164. However, the Fourteenth Amendment, incorporating the Free Exercise Clause of the First Amendment, does not protect individuals practicing their religious beliefs from the operation of neutral law. See Smith, 494 U.S. at 879. Because RFRA's protection went far beyond the protection offered by the Smith Court's authoritative interpretation of the First Amendment, as incorporated into the Fourteenth Amendment, Congress exceeded the authority provided in § 5 of the Fourteenth Amendment to enforce the Amendment. See Flores, 117 S. Ct. at 2164 ("Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause. Congress does not enforce a constitutional right by changing what the right is."); id. at 2170 ("RFRA is so out of proportion to a supposed remedial or preventive

object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior. It appears, instead, to attempt a substantive change in constitutional protections.").

## B. Severability

The <u>Flores</u> Court did not reach any decision as to the constitutionality of RFRA as applied to federal law. By its terms, the Fourteenth Amendment is applicable only to the states, and not to the federal government. <u>See</u> U.S. Const. amend. XIV, § 1. In applying RFRA to the federal government, Congress relied on its enumerated powers in Article I of the Constitution. <u>See</u> H.R. Rep. No. 103-88, at 17 (1993) ("Finally, the Committee believes that Congress has the constitutional authority to enact [RFRA]. Pursuant to Section 5 of the Fourteenth Amendment and the Necessary and Proper Clause embodied in Article I, Section 8 of the Constitution, the legislative branch has been given the authority to provide statutory protection for a constitutional value . . . ."). In concluding that Congress could not rely on § 5 of the Fourteenth Amendment to impose RFRA on state governments, the <u>Flores</u> Court did not address whether Congress could, pursuant to its Article I authority, constitutionally impose RFRA on <u>federal</u> law. Despite this omission, the Trustee in the instant case contends that the Supreme Court's decision in <u>Flores</u> "means that RFRA is a dead-letter" and that "[t]his Court cannot apply it here." Appellee's Br. at 2. We disagree.

Where the Supreme Court strikes down one portion of a statute, we must presume that other portions of the same statute remain in effect "unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not." <u>INS v. Chadha</u>, 462 U.S. 919, 931-32 (1983) (quotations and alteration omitted); <u>see also</u> <u>Alaska Airlines, Inc. v.</u>

-12-

Brock, 480 U.S. 678, 684 (1987) ("Congress could not have intended a constitutionally flawed provision to be severed from the remainder of the statute <u>if the balance of the legislation is incapable of functioning independently</u>." (emphasis added)).  Congress's goal in enacting RFRA was to protect religious liberties as fully as possible from encroachment by all government actors.   RFRA's protection against federal interference with religious liberties is independent and distinct from its protection against state interference, and there is nothing in RFRA's text or legislative history to suggest that Congress would

have declined to protect religious liberties from federal interference merely because it was unable to protect those liberties from state interference.  Assuming that RFRA is constitutional as applied to federal law, we conclude that the portion of RFRA applicable to the federal government is fully severable from the portion applicable to the states.  See Alaska Airlines, 480 U.S. at 684 ("A court should refrain from invalidating more of the statute than is necessary.  Whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid." (quotations and alterations omitted)).

## III.

The Trustee argues that RFRA violates the separation of powers doctrine and the Establishment Clause of the First Amendment, and is therefore unconstitutional as applied to federal law.  We address these issues in turn.

## A. Separation of Powers: The Bankruptcy Clause and the Necessary and Proper Clause

The Trustee apparently suggests that, because Congress disagreed with the Supreme Court's interpretation of the First Amendment, RFRA necessarily constitutes a violation of the separation of powers doctrine.  We disagree.

The framers of the Constitution created co-equal branches of government with distinct responsibilities and authorities.  "The essential balance created by this allocation of authority was a simple one.  The Legislature would be possessed of power to prescribe the rules by which the duties and rights of every citizen are to be regulated,

but the power of the interpretation of the laws would be the proper and peculiar province of the courts." Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 222 (1995) (quotations and alterations omitted). The judicial authority to "say what the law is"

extends to the interpretation of the Constitution itself.  See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176-77 (1803).  While Congress can seek to change the meaning of the Constitution through amendment, see U.S. Const. art. V, it may not do so through the passage of ordinary legislation.  See Flores, 117 S. Ct. at 2168 ("If Congress could define its own powers by altering the Fourteenth Amendment's meaning, no longer would the Constitution be 'superior paramount law, unchangeable by ordinary means.' It would be 'on a level with ordinary legislative acts, and, like other acts, . . . alterable when the legislature shall please to alter it.'" (ellipses in original) (quoting Marbury, 5 U.S. (1 Cranch) at 177)).

While Congress cannot, through ordinary legislation, amend the Court's authoritative interpretation of the Constitution, "congressional disapproval of a Supreme Court decision does not impair the power of Congress to legislate a different result, as long as Congress had that power in the first place."  United States v. Marengo County Comm'n, 731 F.2d 1546, 1562 (11th Cir. 1984); see also Flores, 117 S. Ct. at 2171 ("When Congress acts within its sphere of power and responsibilities, it has not just the right but the duty to make its own informed judgment on the meaning and force of the Constitution.  This has been clear from the early days of the Republic."). Congress has often provided statutory protection of individual liberties that exceed the Supreme Court's interpretation of constitutional protection.  See, e.g., Privacy Protection Act of 1980, 42 U.S.C. §§ 2000aa to 2000aa-12 (reacting to Zurcher v. Stanford Daily, 436 U.S. 547 (1978), and providing journalists with greater protection against searches and seizures); National Defense Authorization Act for Fiscal Years 1988 and 1989, § 508, 10 U.S.C. § 774 (reacting to Goldman v. Weinberger, 475 U.S. 503 (1986), and providing that members of military were entitled to wear religious headgear); cf Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) (reacting to Geduldig v. Aiello, 417 U.S. 484 (1974), and equating employment discrimination based on pregnancy with employment discrimination based on gender).  Because Congress need not agree with everything the Supreme Court does in order for its legislation to pass constitutional muster, we conclude that RFRA is not contrary to the

Constitution merely because Congress disagreed with the <u>Smith</u> Court's interpretation of the Free Exercise Clause.

The key to the separation of powers issue in this case is thus not whether Congress disagreed with the Supreme Court's constitutional analysis, but whether Congress acted beyond the scope of its constitutional authority in applying RFRA to federal law. Because the "principle of the law of federal courts [is] that constitutional issues affecting legislation will not be determined in broader terms than are required by the precise facts to which the ruling is to be applied," <u>EEOC v. Catholic Univ. of Am.</u>, 83 F.3d 455, 469 (D.C. Cir. 1996) (quotations and alteration omitted), we examine whether Congress had the constitutional authority to apply RFRA to the Bankruptcy Act.

Article I of the Constitution gives Congress the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. Unlike the limited scope of authority granted to Congress by § 5 of the Fourteenth Amendment to enforce that Amendment, "Congress has plenary authority in all cases in which it has substantive legislative jurisdiction, so long as the exercise of that authority does not offend some other constitutional restriction." <u>Chadha</u>, 462 U.S. at 941 (quotations and citation omitted). The Supreme Court has explained that Congress's authority under the Bankruptcy Clause

> extends to all cases where the law causes to be distributed, the property of the debtor among his creditors; this is its least limit. Its greatest, is the discharge of a debtor from his contracts. And all intermediate legislation, affecting substance and form, but tending to further the great end of the subject--distribution and discharge--are in the competency and discretion of Congress. With the policy of a law, letting in all classes,--others as well as traders; and permitting the bankrupt to come in voluntarily, and be discharged without the consent of his creditors, the courts have no concern; it belongs to the lawmakers.

-17-

Hanover Nat'l Bank v. Moyses, 186 U.S. 181, 186 (1902) (quotations omitted).

The Constitution also gives Congress the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its bankruptcy power. U.S. Const. art. I, § 8, cl. 18. In considering the authority granted by the Necessary and Proper Clause to Congress to execute the powers enumerated in Article I, the Supreme Court has explained that:

> [W]e think the sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.

M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 421 (1819).

We conclude that RFRA is an appropriate means by Congress to modify the United States bankruptcy laws. In attempting to avoid the Youngs' tithes to the church, the Trustee relied on an affirmative act of Congress defining which transactions of debtors in bankruptcy may be avoided. See 11 U.S.C. § 548(a)(2)(A). RFRA, however, has effectively amended the Bankruptcy Code, and has engrafted the additional clause to § 548(a)(2)(A) that a recovery that places a substantial burden on a debtor's exercise of religion will not be allowed unless it is the least restrictive means to satisfy a compelling governmental interest. See 42 U.S.C. § 2000bb-1(a) & (b). The Trustee has not contended, and we can conceive of no argument to support the contention, that Congress is incapable of amending the legislation that it has passed. See Catholic Univ. of Am., 83 F.3d at 470 ("We doubt that [a Title VII plaintiff challenging the constitutionality of RFRA as applied to federal law] would argue that

-18-

Congress lacks at least the facial authority to determine against whom, and under what circumstances, Title VII and other federal laws will be enforced."). Neither can we accept any argument that allowing the discharge of a debt in bankruptcy and preventing the recovery of a transfer made by insolvent debtors is beyond the authority of Congress. See Hanover Nat'l Bank, 186 U.S. at 186. We therefore conclude that Congress had the authority to enact RFRA and make it applicable to the law of bankruptcy.

## B. Establishment Clause

In enacting RFRA, Congress sought to preserve First Amendment values by protecting the exercise of religious beliefs from substantial burdens imposed by the operation of otherwise neutral laws. See S. Rep. No. 103-111, at 14 (1993), reprinted in 1993 U.S.C.C.A.N. 1892, 1903. Although the Supreme Court has repeatedly held that excepting religious organizations from the sweep of neutral laws does not violate the Constitution, see, e.g., Corporation of the Presiding Bishop v. Amos, 483 U.S. 327, 338-40 (1987) (exemption from federal antidiscrimination laws for religious organizations does not violate Establishment Clause); Gillette v. United States, 401 U.S. 437, 460 (1971) (exemption from military draft for religious conscientious objectors does not violate Establishment Clause); Walz v. Tax Comm'n, 397 U.S. 664, 680 (1970) (state property tax exemption for religious organizations does not violate Establishment Clause), the Trustee nevertheless contends that Congress violated the Establishment Clause of the First Amendment. We disagree.

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion."

U.S. Const. amend. I.  The Supreme Court has explained that "[t]he language of the Religion Clauses of the First Amendment is at best opaque," Lemon v. Kurtzman, 403 U.S. 602, 612 (1971), and that a "law 'respecting' the proscribed result, that is, the establishment of religion, is not always easily identifiable as one violative of the Clause."  Id.  The Court has, however, identified "three main

evils against which the Establishment Clause was intended to afford protection: sponsorship, financial support, and active involvement of the sovereign in religious activity."  Id. (quotations omitted); see also Gillette, 401 U.S. at 449 (noting that "the central purpose of the Establishment Clause" is "ensuring governmental neutrality in matters of religion").

The Supreme Court's interpretation of the Establishment Clause does "not call for total separation between church and state; total separation is not possible in an absolute sense.  Some relationship between government and religious organizations is inevitable." Lemon, 403 U.S. at 614.  Indeed, the "Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause," Hobbie v. Unemployment Appeals Comm'n, 480 U.S. 136, 144-45 (1987) (quotations omitted), and that "[t]he limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause."  Walz, 397 U.S. at 673.

The Lemon Court warned that, in determining whether the Establishment Clause has been violated, courts are not "to engage in a legalistic minuet in which precise rules and forms must govern.  A true minuet is a matter of pure form and style, the observance of which is itself the substantive end.  Here we examine the form of the relationship for the light that it casts on the substance."  Lemon, 403 U.S. at 614.  In examining this substance, the Supreme Court crafted a three-part test to

determine if a statute avoids a violation of the Establishment Clause:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion.

Id. at 612-13 (quotations and citations omitted).  We believe that RFRA has met each of these three elements.

We conclude that RFRA, although designed to protect religious rights, has a secular purpose.  That a law must have a secular purpose "does not mean that the law's purpose must be unrelated to religion--that would amount to a requirement that the government show a callous indifference to religious groups, and the Establishment Clause has never been so interpreted."  Corporation of the Presiding Bishop, 483 U.S. at 335 (quotations and citations omitted).  Rather, the Supreme Court has explained that "Lemon's 'purpose' requirement aims at preventing the relevant governmental decisionmaker--in this case, Congress--from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters."  Id.

Congress's purpose in enacting RFRA was not to benefit a particular religious sect, but rather to protect one of "the most treasured birthrights of every American"--the "right to observe one's faith, free from Government interference."  S. Rep. No. 103-111, at 4, reprinted in 1993 U.S.C.C.A.N. at 1893-94.  This effort to protect First Amendment values is "neutral in the sense of the Establishment Clause."  Gillette, 401 U.S. at 453.  The Supreme Court has explained that "it is hardly impermissible for Congress to attempt to accommodate free exercise values, in line with our happy tradition of avoiding unnecessary clashes with the dictates of conscience."  Id. (quotations omitted); see also Corporation of the Presiding Bishop, 483 U.S. at 335 ("[I]t is a permissible legislative purpose to alleviate

-23-

significant governmental interference with the ability of religious organizations to define and carry out their religious missions.").

Nor do we believe that RFRA improperly advances or inhibits religion under the second prong of the <u>Lemon</u> test.  Rather than providing an affirmative benefit to religion, RFRA only protects individuals from laws which "substantially burden a person's exercise of religion." 42 U.S.C. § 2000bb-1(a).  As the Supreme Court has

noted, "[a] law is not unconstitutional simply because it _allows_ churches to advance religion, which is their very purpose.  For a law to have forbidden 'effects' under _Lemon_, it must be fair to say that the government itself has advanced religion through its own activities and influence."  _Corporation of the Presiding Bishop_, 483 U.S. at 337 (emphasis in original).

It is true, of course, that RFRA treats religion differently than irreligion.  In a brief, separate concurrence to the opinion in _Flores_, Justice Stevens stated his belief that RFRA "is a 'law respecting an establishment of religion' that violates the First Amendment to the Constitution" because "governmental preference for religion, as opposed to irreligion, is forbidden by the First Amendment."  _Flores_, 117 S. Ct. at 2172 (Stevens, J., concurring).  This viewpoint is in direct contradiction to the declaration of a majority of the Supreme Court in _Corporation of the Presiding Bishop_, where the Court explained that it

> has never indicated that statutes that give special consideration to religious groups are _per se_ invalid.  That would run contrary to the teaching of our cases that there is ample room for accommodation of religion under the Establishment Clause. Where, as here, government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption come packaged with benefits to secular entities.

483 U.S. at 338 (citation omitted); _see also_ _Gillette_, 401 U.S. at 454 ("'Neutrality' in matters of religion is not inconsistent with 'benevolence' by way of exemptions from

-25-

onerous duties, so long as an exemption is tailored broadly enough that it reflects valid secular purposes." (citation omitted)).

Finally, it does not appear to us that RFRA "foster[s] an excessive government entanglement with religion." Lemon, 403 U.S. at 613 (quotations omitted). Indeed, RFRA was designed to prevent such an entanglement by limiting the impact that neutral

laws have on religion. See Corporation of the Presiding Bishop, 483 U.S. at 339 ("It cannot be seriously contended that [the statute] impermissibly entangles church and state; the statute effectuates a more complete separation of the two and avoids the kind of intrusive inquiry into religious belief that the District Court engaged in in this case. The statute easily passes muster under the third part of the Lemon test.").

RFRA fulfills each of the elements presented in the Lemon test, and we conclude that Congress did not violate the Establishment Clause in enacting RFRA. Because the portion of RFRA applicable to federal law violates neither the separation of powers doctrine nor the Establishment Clause, we conclude that RFRA is constitutional. Accordingly, we reinstate our earlier decision in this matter, and again reverse the district court.

BOGUE, Senior District Judge, dissenting.

I respectfully dissent on two grounds. Initially, assuming as the majority concludes, that RFRA is constitutional as applied to federal law, I re-urge my dissent contained in this Court's original opinion reversing the district court in this matter. See, Christians v. Crystal Evangelical Free Church (In re Young), 82 F.3d 1407, 1421-1423 (8ᵗʰ Cir. 1996). I would conclude that the trustee's recovery of the tithed monies does not substantially burden the debtors' free exercise rights, that the bankruptcy code and § 548(a)(2) further a compelling governmental interest, and that § 548(a)(2) is the least restrictive means of furthering that interest. Id.

Alternatively, I would hold that RFRA is unconstitutional even as applied to federal law, and on that basis affirm the district court. Our instruction on the remand from the Supreme Court is to conduct further proceedings *in light of* City of Boerne v. Flores. As the majority indicates, in Flores the Supreme Court held RFRA unconstitutional as applied to state law because Congress exceeded its enforcement powers under § 5 of the Fourteenth Amendment. In my opinion, however, Flores does

more than merely declare RFRA unconstitutional as applied to state law.  In broader terms, <u>Flores</u> dictates that, despite the broadest reach of Congress' plenary powers, there is a point beyond which Congress may not go in the exercise the of its power without intruding upon the core function of the judicial branch, thereby offending "vital principles necessary to maintain separation of powers. . . ." <u>Flores</u>, 117 S.Ct. 2157, 2172 (1997).  This rationale of <u>Flores</u> applies to federal law, as well as state law.


In addition to its holding that RFRA exceeded Congress' enforcement power because it so lacked congruence and proportionality that it could not be considered remedial or preventive legislation, <u>Flores</u> also held that RFRA went "beyond congressional authority" by invading the "province of the Judicial Branch." <u>Id</u>. at 2172.  RFRA was both beyond the scope of the power of Congress and violative of the separation of powers doctrine.  Congress makes no secret of the fact that the express purpose of RFRA is to displace  the Supreme Court's decision in <u>Employment Div. v. Smith</u>, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), and  return the Court's "compelling interest" test to Free Exercise jurisprudence. <u>See</u>, 42 U.S.C. § 2000bb(b) (the act's stated purposes are "to restore the compelling interest test as set forth in [the Court's pre-<u>Smith</u> cases] and to guarantee its application in all cases where free exercise of religion is substantially burdened"); <u>and</u>, <u>Flores</u>, 117 S.Ct. at 2160 and 2171 (RFRA was enacted "in direct response to the Court's decision in [<u>Smith</u>]" and attempts a "substantive change of its holding").   In essence Congress, through RFRA, attempts to impose upon the judiciary, a standard of review for interpreting constitutional rights which it believes is a better standard than that crafted by the Court itself.   This

extraordinary exercise of power is postured as the creation of a "claim or defense to persons whose religious exercise is substantially burdened by government". 42 U.S.C. § 2000bb(b). The very existence of one's "claim" or right to be free from substantial burdens on the exercise of his or her religion, however, derives from the Supreme Court's interpretation of the constitution and its opinion as to what it means to have a right to the "free exercise" of one's religion. As the Flores Court explained, because the text of the First Amendment is ambiguous on the meaning of "free

exercise,"[1] we look to the Court to interpret the Constitution and the Free Exercise clause in its exclusive province to "say what the law is." <u>Flores</u>, 117 S.Ct. at 2172 (citing <u>Marbury v. Madison</u>, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803)). Thus, when the Supreme Court decrees, insofar as one's right of free exercise is concerned, that a facially neutral, generally applicable law may be applied to religious practices even when not supported by a compelling governmental interest, <u>Smith</u>, 494 U.S. at 879, 110 S.Ct. at 1600, that decree defines the parameters of the constitutional right. And although Congress has the power to "enforce" constitutional rights, <u>Flores</u>, 117 S.Ct. at 2163, it is powerless to enforce a free exercise right different from that which the Supreme Court has determined to be the right. <u>Id</u>. at 2164. ("Congress does not enforce a constitutional right by changing what the right is."). Yet this is precisely what Congress is attempting to do with its passage of RFRA. <u>See</u>, Eugene Gressman, *The Necessary and Proper Downfall of RFRA*, 2 Chapman Univ. Nexus Journal of Opinion, 73, 77 (1997)("RFRA is designed to protect the rights the judiciary would find and protect if the courts were to use the compelling governmental interest test with respect to neutral laws that incidentally burden religious exercises."). Such attempt, even as applied to federal law, in my opinion, is a serious breach of the separation of powers doctrine.

"The power to interpret the Constitution in a case or controversy remains in the Judiciary," <u>Flores</u>, 117 S.Ct at 2166, and "[w]hen the Court has interpreted the Constitution, it has acted within the province of the Judicial Branch, which embraces the duty to say what the law is." <u>Id</u>. at 2172. This duty represents one of the core functions of the Judicial Branch, reserved to it by the Constitution. U.S. Const. art. III § 2. "The judicial authority to determine the constitutionality of laws, in cases and controversies, is based on the premise that the 'powers of the legislature are defined and limited . . . .'" <u>Flores</u>, 117 S.Ct. at 2162 (citing <u>Marbury</u>, 1 Cranch at 176). Yet,

---

[1]"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.

RFRA is expressly "designed to control cases and controversies." Id. at 2172; 42 U.S.C. 2000bb(b)(1) . By forcing a standard of review upon the Article III judiciary, for the Court to apply in its adjudication of cases and controversies, Congress has gone beyond its limited and defined powers, intruded upon, and usurped a core function of the Article III branch.

The separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch. United States v. Lopez, 514 U.S. 549, 552, 115 S.Ct. 1624, 1626, 131 L.Ed.2d 626 (1995)(citation omitted). "[T]he system of separated powers and checks and balances established in the constitution was regarded by the Framers as a 'self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other.'" Morrison v. Olson, 487 U.S. 654, 693, 108 S.Ct. 2597, 2620, 101 L.Ed. 2d 569 (1988)(citation omitted). Maintaining the separation of powers is an essential part of the Constitutional structure and plays a vital role in securing freedom for all. Lopez, 514 U.S. at 578, 115 S.Ct. at 1639 (Kennedy, J., concurring). "[T]he courts retain the power, as they have since *Marbury v. Madison*, to determine if Congress has exceeded its authority under the Constitution." Flores, 117 S.Ct. at 2172. To that end,

> [w]hen the political branches of the Government act against the background of a judicial interpretation of the constitution already issued, it must be understood that in later cases and controversies the Court will treat its precedents with the respect due them under settled principles, including stare decisis, and contrary expectations must be disappointed.

Id.

In Lopez, the Supreme Court invalidated the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q), on grounds that Congress exceeded its authority under the Commerce Clause to regulate commerce among the several states. Lopez, 514 U.S. at

551, 115 S.Ct. at 1626.  The Act made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe is a school zone." Id.  But because by its terms the statute had nothing to do with  commerce or any economic enterprise whatsoever, and did not substantially affect interstate commerce, Congress lacked the power to enact the legislation in the first instance. Id., 514 U.S. at 561, 115 S.Ct. at 1630-31.  The Lopez opinion confirms that Congress' plenary power, though broad indeed, is subject to outer limits which the Court has ample power to enforce, and will enforce. Id., 514 U.S. at 557, 115 S.Ct. at 1628-29.  Preservation of the constitutional structure is of primary importance to all officers of the Government, and it is the duty of the Court to "intervene when one or the other [branch] of Government has tipped the scales too far." Id., 514 U.S. at 578, 115 S.Ct. at 1639 (Kennedy, J., concurring). More recently the Court reemphasized the importance of  maintaining the constitutional structure and separation of powers, and reaffirmed its duty to call into check impermissible exercises of Congressional power. See, Printz v. United States, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997)(striking portions of the Brady Handgun Violence Prevention Act as beyond Congress' authority to enact pursuant to its powers under the Commerce and Necessary and Proper clauses); See also, New York v. United States, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992)(declaring Congress powerless to compel states to enact or administer federal radioactive waste regulatory programs).  With respect to RFRA as applied to federal law, the Court has the power and obligation to check exercises of Congressional power which it deems excessive and unconstitutional.  In my opinion,  Flores and the Court's precedents do as much.

The majority concludes that Congress has the authority to enact RFRA and graft it onto all federal congressional law, and onto § 548(a)(2)(A) of the Bankruptcy Code in particular. Slip Op. at 11.  I agree with the majority that Congress, in its plenary power to establish "uniform Laws on the subject of Bankruptcies, " is indeed capable of amending any bankruptcy legislation that it has passed. Establishment Clause issues aside, there is no question that Congress could re-draft § 548 to include an exemption,

for all religious tithes, from the avoidance power of the trustee. But that is not what Congress did here. What Congress did, in reality, was attempt to make a substantive change in free exercise rights, and then impose its interpretation of what the right ought to be onto the courts via "grafts" onto every federal law. Before one can say that Congress may permissibly change the Bankruptcy Code to accommodate the provisions of RFRA, however, one must assume the constitutionality of RFRA in the first instance. But if RFRA does not pass constitutional muster, as I conclude, then Congress is powerless to change the Bankruptcy Code through its power under the Necessary and Proper Clause. That is, although Congress has "the power '[t]o make all Laws which shall be necessary and proper for carrying into Execution' its bankruptcy power," Slip Op. at 11, it does not have the power to execute its bankruptcy power with a law which is not necessary and proper for that purpose.

As the majority notes, "[i]n considering the authority granted by the Necessary and Proper Clause to Congress to execute the powers enumerated in Article I the Supreme Court has explained: . . . 'Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the constitution, are constitutional.'" Slip Op. at 11 (citing, M'Culloch v. Maryland, 17 U.S. (4 Wheat) 316, 421 (1819). This three prong M'Culloch test is used to assess the validity of the exercise by Congress of any of its powers pursuant to the Necessary and Proper Clause. In Flores, the Court indicated that RFRA, as applied to state a law, failed the first prong of the M'Culloch test. Flores, 117 S.Ct. at 2164 (legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the clause under § 5 of the Fourteenth Amendment). I would conclude that it fails the first prong as applied to federal law as well. As noted, Congress' express intent in passing RFRA was to restore the compelling interest test to Free Exercise jurisprudence. 42 U.S.C. § 2000bb(b). This seeks to change the Court's interpretation of the Free Exercise Clause and work a substantive change in free exercise rights, which is not a "legitimate end," and which cannot fairly be said to be necessary and proper for carrying into

execution the Bankruptcy powers. See also, Gressman, 2 Chapman Univ. Nexus Journal of Opinion at 82-83 (arguing RFRA as applied to federal law fails all three prongs of M'Culloch test). To paraphrase the Printz decision,"[w]hen a law . . . for carrying into execution the [Bankruptcy Clause] violates the principle of [separation of powers] . . . it is not a law . . . proper for carrying into execution of the [Bankruptcy Clause], and is thus, in the words of the Federalist, 'merely an act of usurpation' which deserves to be treated as such." Printz, 117 S.Ct. at 2379 (internal quotations and citations omitted).

I do not suggest by my dissent that Congress' goal of "protect[ing] religious liberties as fully as possible from encroachment by all government actors," Slip Op. at 7, is somehow evil or untoward. To the contrary, Congress' efforts to protect religious freedom are most commendable and rightly pursued through the proper channels (e.g., a constitutional amendment); but not at the expense of the constitution.

> Much of the Constitution is concerned with setting forth the form of our government, and the courts have traditionally invalidated measures deviating from that form. The result may appear 'formalistic' in a given case to partisans of the measure at issue, because such measures are typically the product of the era's perceived necessity. But the Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day.

New York, 505 U.S. at 187, 112 S.Ct. at 2434.

I believe that with the passage of RFRA, Congress has gone beyond its authority and "tipped the scales too far." It has impermissibly intruded upon the province of the Article III branch by imposing upon the courts a standard of review to be applied in all cases and controversies involving the free exercise of religion. Accordingly, I would conclude that RFRA is unconstitutional as applied to federal law. It follows, therefore,

that I would affirm the order of district court allowing the trustee to bring the tithed monies back into the debtors' estate pursuant to 11 U.S.C. § 548(a).

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.