**KICKAPOO TRADITIONAL TRIBE OF TEXAS, Plaintiffs,**

v.

**Martha CHACON and the State of Texas, Defendants.**

**No. Civ.A. DR–99–CA–14–OG.**

United States District Court,
W.D. Texas,
Del Rio Division.

April 6, 1999.

Roberto L. Rodriguez, Attorney at Law, Eagle Pass, TX, Ricardo Calderon, Attorney at Law, San Antonio, TX, for plaintiffs.

Michael Winget–Hernandez, Assistant Attorney General of Texas, Austin, TX, Ernest G. Mireles, Maverick County Attorney, Eagle Pass, TX, for defendants.

### ORDER GRANTING DEFENDANTS' REQUEST FOR EMERGENCY RELIEF, VACATING TEMPORARY RESTRAINING ORDER AND GRANTING JUDGMENT IN FAVOR OF DEFENDANTS ON THE MERITS

ORLANDO L. GARCIA, District Judge.

The issue in this case is whether the Kickapoo Traditional Tribe of Texas (the "Tribe") can prevent authorities of the State of Texas from disinterring the body of one of its tribe members, Ms. Norma Rodriguez, in order to conduct an autopsy to determine how she died. It brings into play the clash between the Tribe's sincerely held religious beliefs and the State's interest in assuring that the death was not

the result of foul play. In the emergency motion now before the Court, the State of Texas and Martha Chacon ask the Court to dissolve a temporary restraining order entered by the state court to prevent exhumation "because the body which is the subject of the inquest was not embalmed, and as a result of its interment, is rapidly losing value as a source of information about the circumstances of the death of Norma Rodriguez." (Mot. at 3.) For the reasons explained below, the State and Chacon's motion is granted and judgment is entered in their favor on the Tribe's claims in this lawsuit.[1]

I. *Factual and Procedural History.*

The following summarizes the central facts surrounding this dispute as revealed in the hearing conducted on March 15 and 16, 1999. Other facts are discussed as they become relevant to the Court's legal analysis.

Late in the afternoon of March 2, 1999, Sulema Garza notified emergency personnel that she observed her friend, Norma Rodriguez, having breathing problems. Rodriguez was in her locked home located across the street from the Kickapoo reservation in Eagle Pass, Texas. By the time EMS arrived, Rodriguez was dead. Sheriff's deputies notified Martha Chacon, a Justice of the Peace for Maverick County, of these events, and she arrived at the scene a short time later. The deputies informed Chacon that they were aware that Rodriguez was an inhalant abuser and that they suspected she had died from inhalant (spray paint) poisoning. Chacon then examined Rodriguez's nose, mouth, hands and body for signs of spray paint, but found none. No items indicating that Rodriguez had recently inhaled paint were found near the body.

Chacon then interviewed Garza to determine what she knew about the circumstances of Rodriguez's death. Garza related that the decedent had a prior history of high blood pressure, but that it had been under control and that Rodriguez had not been taking any medications. Chacon also interviewed the decedent's mother, Gloria Elizondo, who had arrived at the scene. According to Chacon, Elizondo was distraught and stated that "somebody killed her, I know somebody killed her." At that point, given the lack of evidence on or around the body that Rodriguez had died from inhaling paint and her mother's statement that someone had killed Rodriguez, Chacon determined that an autopsy was necessary to determine cause of death. She asked Elizondo if she would agree with that decision, and Elizondo allegedly did. Chacon then verbally instructed a deputy to inform the funeral director, Rodolfo Guerrera, that she had ordered an autopsy and that the body should be transported to Bexar County for that purpose.[2]

Chacon returned to her office, notified the Bexar County Medical Examiner's Office that she had requested an autopsy, and prepared an order authorizing it. While there, she received a telephone call from the funeral director, who indicated that he was receiving conflicting instructions about his disposition of the body from persons still at Rodriguez's home. According to Chacon, the funeral director stated that Raul Garza, the Tribe's chief, insisted that no autopsy be done. Chacon testified that she made it plain to the director that she had ordered the autopsy.

When she went home that evening, Chacon received numerous telephone calls from Tribe members and County officials

---

**1.** On March 15 and 16, 1999, the Court conducted a hearing on the emergency motion. Because of the exigent circumstances, the Court orally granted the motion from the bench at the conclusion of the hearing and entered a short written order memorializing that ruling the same day. The Court further indicated that it would issue a full opinion in the matter, and this order fulfills that promise.

**2.** Maverick County has no facilities with which to conduct autopsies; therefore, autopsies are performed by the Bexar County Medical Examiner's Office.

trying to dissuade her from following through with the autopsy. In response to these calls, Chacon agreed to a meeting at the tribal office that night, arriving there at approximately 10:30 p.m. Chacon requested to meet privately with the decedent's mother, Ms. Elizondo, to confirm that Elizondo understood what an autopsy was and, with that understanding, would continue to acquiesce in Chacon's decision to order one. Elizondo allegedly again stated that she believed someone had killed her daughter, that she knew what an autopsy was, and that she did not object to Chacon's decision. Other tribe members present at that meeting attempted to convince Chacon that it was clear that Rodriguez had died from inhalant poisoning and that an autopsy was not necessary. They produced a bag full of items taken from the decedent's back yard, primarily paint cans, paper cups with paint in them and a T-shirt with gold paint on it.[3] Chacon testified that, at the conclusion of the meeting, she made clear to those present that she had not changed her mind about the need for an autopsy.

After returning home, Chacon received a telephone call from Ricardo Calderon, an attorney for the Tribe, in the early morning hours of March 3. Chacon stated that Calderon explained the nature of the Tribe's religious beliefs and the reasons why an autopsy was contrary to those beliefs. He again requested Chacon to change her mind. According to Chacon, she nevertheless told Calderon that her position on the autopsy had not changed.[4]

Later that morning, when Chacon went in to work, she received a telephone call from an employee of the Bexar County Medical Examiner's Office regarding when

he could expect Rodriguez's body to arrive. Chacon responded that she would check with the funeral home. When she called the funeral home, however, an employee informed her that the body was not there and that it had been buried on tribal land. Chacon then issued the order that is the centerpiece of this dispute: the order for the disinterment and autopsy of the body of Norma Rodriguez.

Upon learning of the unauthorized burial of the body, Chacon also contacted the District Attorney, who indicated he would investigate the matter further. According to Chacon, the District Attorney called a meeting in his office in the afternoon of March 4, at which tribal representatives once again presented Chacon with information that they asserted established the cause of death as inhalant poisoning. Chacon remained unconvinced and refused to rescind her disinterment and autopsy order. The Tribe then attempted to appeal Chacon's decision to County Court, but Chacon thwarted that effort by refusing to sign an appeal bond. Consequently, on March 8, the Tribe filed the instant declaratory judgment action in the 293rd Judicial District in Maverick County, naming both the State and Chacon as defendants.

In its petition, the Tribe asserted two claims. First, it alleged that Chacon's disinterment and autopsy order was "invalid and void as the procedures set out in the Native American Graves Protection and Repatriation Act were not complied with," (Pet. at 2), and second, that "[s]uch action would amount to an unlawful interference with the religious beliefs of the [Tribe]," (*id.*) In addition, the Tribe moved ex parte for an order temporarily restraining

---

**3.** This evidence was not collected by law enforcement authorities, but by persons affiliated with Healing Grounds, a publicly funded inhalant abuse facility operating on the reservation.

**4.** The Tribe called Calderon as a witness at the hearing to testify about this conversation. Calderon has entered his appearance in this case as counsel for the Tribe. Therefore, the

prospect of his testimony raised serious concerns, including the potential for his disqualification from the case, *see FDIC v. United States Fire Ins. Co.*, 50 F.3d 1304, 1315 (5th Cir.1995). Nevertheless, for the reasons explained in further detail below, his testimony was not relevant to the issues before the Court, and, therefore, not necessary in this case.

enforcement of Chacon's order, which the state court granted within minutes of the action's filing.

On March 11, the State removed this action to federal court, premising jurisdiction on existence of a federal question under the Native American Graves Protection and Repatriation Act. *See* 25 U.S.C. § 3013 (establishing federal court jurisdiction over "any action brought by any person alleging a violation" of the Act); *see also* 28 U.S.C. § 1362 (providing for federal court jurisdiction over civil actions brought by Indian tribes arising under the federal constitution or federal law). The State and Chacon filed the instant motion for emergency relief the following day, seeking an order from this Court vacating the state court's ex parte temporary restraining order.

## II. *Procedural Issues.*

The State and Chacon do not expressly state the procedural basis for their motion; however, the Court construes it as one for relief under Fed.R.Civ.P. 65. Determining which party bears the burden on the motion, however, is complicated by its history in state court. At the time of removal, the Tribe had obtained an ex parte temporary restraining order from state court. Hearing on its request for preliminary injunctive relief was set for the morning of March 16, 1999. Had the case not been removed, the Tribe clearly would have borne the burden at that hearing to demonstrate its entitlement to continued injunctive relief. Consequently, by the instant motion, Defendants have effectively expedited that hearing by one half of one day, which, as a consequence of removal, was conducted by this Court. Viewing the

procedural history in this manner, the Tribe bears the burden to establish its entitlement to an injunction against enforcement of the disinterment and autopsy order.[5] Unfortunately, none of the parties adheres to this view.

At the hearing on the motion, the Court requested the parties address the proper allocation of the burden of proof. Both sides stated their position that Defendants, as movants, and not the Tribe, carried the burden to show that the temporary restraining order must be vacated. While the Court does not agree to this assignment of the burden of proof, for the reasons set forth below, it has little, if any, effect on the Court's analysis in this case.

■ In its petition, the Tribe seeks a declaration that the State and Chacon are required under the Native American Graves Protection and Repatriation Act to obtain the consent and permission of the Tribe before executing the order to disinter and autopsy Rodriguez's body. (Pet. at 1.) The Tribe also alleges that disinterment and autopsy "would amount to an unlawful interference with the religious beliefs [prohibiting the disturbance of the bodies of the deceased] of the ... [Tribe] and its right to exercise its religion." (*Id.* at 3–4.) Both of these claims involve issues of law that the Court necessarily must resolve in deciding whether to grant or deny the emergency motion, leaving nothing left for the Court to "declare" for the purposes of the Tribe's underlying declaratory judgment action. More importantly, the historical facts *relevant to the Court's analysis of these two legal issues* are undisputed.[6] In a case in which the relevant facts are undisputed, exigent cir-

---

5. At most, the Defendants would bear the burden to show that the hearing should be expedited. They have carried that burden. In an affidavit attached to Defendants' motion and via live testimony at the hearing, Bexar County Chief Medical Examiner Vincent DiMaio stated that, because Rodriguez's body was not embalmed, the time element was crucial. A delay in the exhumation of five to ten days could make a determination of cause of death impossible.

6. This point is critical. At the hearing, the Tribe presented the testimony of a number of witnesses who contested many of the statements of Justice of the Peace Chacon, Defendants' primary fact witness. The most hotly contested issues were (1) whether Chacon could or should have determined that Rodriguez's cause of death was inhalant poisoning, based on evidence at the death scene or later presented to her by various persons, (2) whether the decedent's mother, Ms. Elizondo,

cumstances exist and the granting preliminary injunctive relief will effectively give a party all of the relief it would obtain after trial on the merits, consolidation of the hearing with trial on the merits under Rule 65(a)(2) is particularly appropriate. *See, e.g. D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 460 (7th Cir.1993). *See generally,* 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2950 at 236–39 (1995).

▇▇▇▇ Here, the Court inquired at the hearing whether disposition of the motion would ultimately be dispositive of the case, and both sides agreed this to be true. The Court then notified the parties of its intent that the hearing on the motion be consolidated with trial on the merits, and no objection was voiced. Consequently, the Court proceeds to consider the merits of the Tribe's claims.[7]

### III. *Violation of the Native American Graves Protection and Repatriation Act.*

The Tribe argues that Chacon's action in issuing the order for the disinterment and

at any time concurred with the Chacon's decision to order the autopsy, (3) whether Chacon at any time indicated to any tribal representative that she had determined that an autopsy was not necessary, thereby giving the Tribe indication that it was appropriate for them to take possession of the body on March 3 and to bury it. These factual issues are irrelevant.

There is no dispute that Chacon issued an order for the exhumation and autopsy of Rodriguez's body. In the course of conducting an inquest, a justice of the peace has the power to issue such an order under state law. *See* Tex.Code Crim.P.Ann. art. 49.04(a) (Vernon Supp.1999) (setting forth circumstances in which inquest required); *id.* art. 49.09(a) (authorizing justice of the peace to order disinterment); *id.* art 49.10(e)(1) (authorizing justice of the peace to order an autopsy). The underlying correctness of that order is not before the Court; in fact, it has no jurisdiction to consider whether an autopsy should or should not be ordered. The Court's job in this case is to merely assume that such an order exists, and to determine whether it can be executed without violating NAGPRA or the Tribe's First Amendment rights.

autopsy of Rodriguez's body is void because it does not comply with the Native American Graves Protection and Repatriation Act (NAGPRA), 42 U.S.C. §§ 3001–13. That Act was passed by Congress in 1990 with two main objectives: first, to protect Native American burial sites and to require excavation of such sites only by permit, and second, to set up a process by which federal agencies and museums holding Native American remains and cultural artifacts will inventory those items and work with tribes to repatriate them. *See* H.R.Rept. No. 101–877, 101 Cong., 2d Sess.1990, *reprinted in* 1990 U.S.C.C.A.N 4367, 4367–68; *United States v. Corrow,* 119 F.3d 796, 799–800 (10th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1089, 140 L.Ed.2d 146 (1998).

▇▇▇▇ Section 3 of the Act contains the particular provision at issue in this case. It states:

(c) Intentional excavation and removal of Native American human remains and objects

The intentional removal from or excavation of Native American cultural items

7. Conversion of a preliminary injunction hearing to trial on the merits cannot be in derogation of a party's right to a jury trial. *See* Fed.R.Civ.P. 65(a)(2). Although seeking a declaratory judgment, the Tribe's underlying claims for injunctive relief are equitable in nature and therefore do not carry with them the right to jury trial. *See Manning v. United States,* 146 F.3d 808, 812 (10th Cir.1998); *Northgate Homes, Inc. v. City of Dayton,* 126 F.3d 1095, 1099 (8th Cir.1997).

In addition, a court must give adequate notice before conversion can take place. *See Air Line Pilots Ass'n Int'l v. Alaska Airlines, Inc.,* 898 F.2d 1393, 1397 (9th Cir.1990). In this case, perhaps the Court could have been more explicit in making its intent clear that the hearing would be considered as one on the merits. Nevertheless, the Tribe cannot escape the fact that it claims in this lawsuit do not require the resolution of disputed facts. For this reason, despite any defect in notice, the Court believes that conversion is proper. *See D. Patrick, Inc.,* 8 F.3d at 459 (district court does not err in "cutting to the chase" where facts material to issues before it are undisputed).

from Federal or tribal lands for purposes of discovery, study, or removal of such items is permitted only if—

(1) such items are excavated or removed pursuant to a permit issued under section 470cc of Title 16 which shall be consistent with this Chapter;

(2) such items are excavated or removed after consultation with or, in the case of tribal lands, consent of the appropriate (if any) Indian tribe or Native Hawaiian organization;

(3) the ownership and right of control of the disposition of such items shall be as provided in subsections (a) and (b) of this section; and

(4) proof of consultation or consent under paragraph (2) is shown.

25 U.S.C. § 3002(c). The Tribe argues that Chacon's disinterment and autopsy order violates this provision because Chacon did not obtain a permit as required under subsection (c)(1), or the consent of the Tribe under subsections (c)(2) and (4). For several reasons, the Court finds that NAGPRA does not apply in these circumstances.

 First, the language of the act itself, its legislative history, and the content of the permitting statute it references—the Archeological Resources Protection Act of 1979—all indicate that the term "human remains" was intended to mean ancient human remains or those with some sort of cultural or archaeological interest. While it is true the Court must begin with the express language of the statute itself, see *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980), in ascertaining the meaning of that language the Court must also consider "the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988); *Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 405, 108 S.Ct. 1255, 99 L.Ed.2d 460 (1988); *Stafford v. Briggs*, 444 U.S. 527, 535, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980) (court must " 'not look

merely to a particular clause in which general words may be used but will take in connection with it the whole statute ... and the objects and policy of the law' "). This is because "even apparently plain words, divorced from the context in which they arise and which their creators intended them to function, may not accurately convey the meaning the creators intended to impart. It is only within context that a word, any word, can communicate an idea." *Leach v. FDIC*, 860 F.2d 1266, 1270 (5th Cir.1988). Consequently, in considering whether the term "human remains" applies to Rodriguez's corpse, the Court looks to the language and intent behind NAGPRA as a whole.

NAGPRA does not define the term "human remains." Instead, this term is included within the category of "cultural items." See 25 U.S.C. § 3001(3). Other "cultural items consist of associated and unassociated 'funerary objects,' 'sacred objects,' and 'cultural patrimony.' *Id.* Under the canon of statutory construction known as *noscitur a sociss*, 'a word is known by the company it keeps.' " *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 694, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). Placement of the term "human remains" within the larger category of "cultural items" thus suggests that NAGPRA was not meant to apply to a recently buried corpse which is of no particular cultural or anthropological interest, but which is sought by state authorities for the purposes of conducting an inquest.

This interpretation is buttressed by the language of the parallel Archaeological Resources Protection Act of 1979 (ARPA), the statute which, under NAGPRA, the permit for excavation is issued. That statute is structured to protect an "archaeological resource," which is defined to include "material remains of past human life ... *which are of archeological interest.*" 16 U.S.C. § 470bb(1) (emphasis added). To obtain a permit under ARPA, the applicant must request one from the federal

land manager having authority over the land. *See id.* § 470cc. The federal land manager, in turn, must make several determinations as a prerequisite to issuing the permit. In particular, he or she must conclude that "the activity is undertaken for the purpose of furthering archeological knowledge in the public interest." *Id.* § 470cc(b)(2). Construing the term "human remains" in NAGPRA in the manner that the Tribe suggests would nullify the permit requirement of NAGPRA, because a state entity could never, under these circumstances, demonstrate that its exhumation of the body was for the purpose of furthering archeological knowledge even if it had a Tribe's consent to exhume. Because related statutes should be construed *in pari materia* and in a manner to give effect to both, *see United States v. Rodriguez,* 60 F.3d 193, 195 (5th Cir.1995), the Tribe's interpretation is not reasonable.

A second provision of NAGPRA also lends credence to the Court's view that it was not intended to apply in these circumstances. NAGPRA contains a savings clause that provides that the act does not "limit the application of any State or Federal law pertaining to theft or stolen property." 25 U.S.C. § 3009(5). Texas law provides that

> [a] person not authorized by law to move the body of a decedent or any part of the physical surroundings of the body commits an offense if the person tampers with a body that is subject to an inquest under Article 49.04 of this code or any part of the physical surroundings of the body. An offense under this section is punishable by a fine in an amount not to exceed $ 500.

Tex.Code Crim.P.Art. 49.05(f) (Vernon Supp.1999). What little case law exists interpreting NAGPRA does not address whether such a body-tampering law could be considered a law "pertaining to theft or stolen property," and the legislative history of the Act sheds little light on this particular provision. Nevertheless, this language Congress's intent that NAG-PRA's protections not supercede the legitimate efforts of state and federal law authorities to enforce applicable criminal laws. That conclusion also makes good sense as a matter of public policy.

While the Court absolutely does not question the veracity of the Tribe's beliefs as to the unearthing and desecration of human remains, the fact of the matter is that the Tribe buried Ms. Rodriguez on tribal land at a time when an inquest was ongoing. Even assuming that the Tribe was mistaken as to that fact and honestly believed that Chacon had changed her position, in less salutary circumstances the Tribe's interpretation of NAGPRA would permit any person to evade an inquest by obtaining possession of a corpse by nefarious means and burying it on tribal lands. Congress apparently never considered this when drafting the statute. Yet one can hardly argue such a result was intended. Accordingly, the Court concludes that the Tribe fails to state a claim under NAG-PRA because the statute is inapplicable to a recently buried corpse that state authorities seek to exhume to determine cause of death in connection with an inquest.

### IV. *Violation of the Tribe's Right to Free Exercise of Religion.*

The Tribe also argues that Chacon's disinterment and autopsy order infringes on its First Amendment right to free exercise of its religion. As certain tribe members explained at the hearing, it is the Tribe's practice to bury deceased members before noon of the day following death. It is also the Tribe's belief that the scarring to the body caused by an autopsy and the disruption of a grave damages the spirit and can have adverse effect on the decedent's family. *See also* H.R.Rept. 101–877, *supra,* at 4372 (noting Native American belief that "spirits of their ancestors would not rest until they are returned to their homeland"). The Defendants do not question the veracity of these beliefs, and neither does the Court. Rather, the Court accepts as true the proposition that the disinter-

ment and autopsy of Rodriguez's body is in clear contravention of the Tribe's religious beliefs. *See Montgomery v. County of Clinton, Mich.*, 743 F.Supp. 1253, 1259 (W.D.Mich.1990) ("It is not for the Court to question the validity of one's interpretation of religious beliefs or practices or to determine the plausibility of a religious claim."), *aff'd*, 940 F.2d 661 (6th Cir.1991). The question before the Court is merely whether the State may constitutionally implement its laws regarding disinterment and autopsy when that implementation substantially impairs the Tribe's ability to freely exercise those beliefs.

█ As initial matter, however, the Court must address the Tribe's standing to assert these first amendment rights. At the hearing on Defendants' motion, counsel for the Tribe argued that the Tribe has standing to assert the rights of its members as *parens patriae*. While this may be generally true, cases in which the *parens patrie* doctrine applies have been limited to those involving the rights of tribe members as a whole, and not those of just one or several members. *See Alabama & Coushatta Tribes of Tex. v. Trustees of Big Sandy Indep. Sch. Dist.*, 817 F.Supp. 1319, 1327 (N.D.Tex.1993) (rejecting Tribe's attempt to assert claim as *parens patriae* of certain tribe members whose children subjected to school hair length restriction, even though restriction "may in some way affect members" of tribe as a whole), *remanded*, 20 F.3d 469 (5th Cir.1994); *Kickapoo Tribe of Okla. v. Lujan*, 728 F.Supp. 791, 795 (D.D.C.1990); *Assiniboine & Sioux Tribes v. Montana*, 568 F.Supp. 269, 277 (D.Mont.1983). *Compare Pueblo of Isleta ex rel. Lucero v. Universal Constructors, Inc.*, 570 F.2d 300, 302 n. 2 (10th Cir.1978) (finding standing based on injury to Tribe's reversionary property interest and declining to consider parens patriae doctrine). Accordingly, the Court cannot agree that the Tribe has demonstrated

that it has standing under the *parens patriae* doctrine to assert a first amendment violation in this context because the rights which it seeks to assert are primarily those of a small group of tribe members—the next of kin of Ms. Rodriguez—and not those of the Tribe as a whole.

Alternatively, assuming that the Court has misconstrued the *parens patriae* doctrine or that the Tribe as a whole has otherwise suffered injury sufficient to confer Article III standing, the Court is compelled to conclude that such injury does not rise to a constitutional level. The proper analysis of this question has changed in recent years, but is now governed by the Supreme Court's 1990 decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). *Employment Division* concerned the constitutionality of a state law that prohibited the payment of unemployment benefits to a person terminated from employment for misconduct. Several employees of a drug rehabilitation organization who were discharged for using peyote in a Native American religious celebration challenged that law as an unconstitutional abridgment of their First Amendment rights. The Supreme Court held that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid or neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion proscribes (or prescribes),'" *id.* at 879, 110 S.Ct. 1595, so long as the law does not infringe some other constitutional right, *id.* at 882, 110 S.Ct. 1595. *See also Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1213 (5th Cir.1991) (*Employment Division* "eviscerates judicial scrutiny of generally applicable criminal statutes in response to free exercise challenges").[8]

8. *Employment Division* itself reflected a change from prior law, in that the Supreme Court rejected the test of *Sherbert v. Verner*, 374 U.S. 398, 402–03, 83 S.Ct. 1790, 10

L.Ed.2d 965 (1963), that governmental actions that substantially burden a religious practice must be justified by a compelling government interest, finding it was limited to

■ In direct response to the decision in *Employment Division,* Congress enacted the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb to –bb–4. Under RFRA, any federal or state law that substantially burdened the free exercise of religion was deemed unconstitutional unless the Government could demonstrate that it furthered a compelling government interest and was the least restrictive means for doing so. *See id.* § 2000bb–1(b). But in its recent decision in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Supreme Court struck down RFRA as unconstitutional as applied to state law because Congress exceeded its powers under Section 5 of the Fourteenth Amendment. Thus, the Tribe's free exercise claim now must be analyzed under the pre-RFRA, *Employment Division* framework. That means that, under the Free Exercise clause, a law that burdens religious practice need *not* be justified by a compelling governmental interest if it is facially neutral and of general applicability, so long as no other constitutional concerns are implicated. *See Employment Division,* 494 U.S. at 879, 110 S.Ct. 1595.[9]

■ The Tribe strives to distinguish *Employment Division* by arguing that Article 49, subchapter A of the Texas Code of Criminal Procedure—setting forth the powers duties of a justice of the peace with regard to inquests, exhumations and autopsies—is not such a facially neutral law, at least not as applied by Chacon. *See* Tex.Code Crim.P.Ann. art. 49, subch. A

(Vernon Supp.1999). Correctly, it points to the Supreme Court's decision in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), as governing this determination. Under *Church of Lukumi,* the Court must begin with an examination of the text of the law. "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context." *Id.* at 533, 113 S.Ct. 2217. In *Church of Lukumi,* the ordinances passed by the City of Hialeah contained the words " 'sacrifice' and 'ritual,' words with strong religious connotations" but also secular meanings. *Id.* at 534, 113 S.Ct. 2217. Although finding the laws facially neutral, the Court went on to hold that such a conclusion was not determinative. Instead, it directed courts to " 'survey meticulously the circumstances of government categories to eliminate . . . religious gerrymanders.' " *Id.* After considering the words used in the ordinances, the text of the city council's enactments, and the effect of the laws in operation, it became clear to the Court that the ordinances at issue had no objective other than to target the Santeria religion and, in particular, its practice of ritual sacrifice. *Id.* at 535, 113 S.Ct. 2217.

The same simply cannot be said of article 49 of the Texas Code of Criminal Procedure. No words of religious connotation are used. The Tribe presented no evidence as to the circumstances of its enactment, and the Court is aware of nothing

the context of unemployment compensation and did not apply to the "across-the-board criminal prohibition" at issue in *Employment Division. See* 494 U.S. at 883–85, 110 S.Ct. 1595.

9. Even were the Court to apply the more strict balancing test formerly mandated by *Sherbert v. Verner* and RFRA, it would be forced to reach the same conclusion. In cases where cause of death is not clearly apparent, Texas's laws relating to disinterment and autopsy serve the state's compelling interest in ensuring that the particular death is not the result of foul play. *See Snyder v.*

*Holy Cross Hosp.,* 30 Md.App. 317, 352 A.2d 334, 341–42 (Md.Ct.Spec.App.1976) (upholding state's compelling interest in autopsy over those of the family of a young Orthodox Jewish man, who died suddenly even though he was in apparent good health). That interest, unfortunately, cannot be protected in a less intrusive manner. As Dr. DiMaio explained, less intrusive tests (such as hair, tissue or fluid sampling) are inconclusive in circumstances such as this, where cause of death can only be determined by a process of elimination, through the examination of the body's organs for signs of other injury or disease.

that would indicate that these fairly mundane provisions of the State's law had were enacted with any intent to infringe on the Tribe's religious beliefs. Clearly, as the Tribe argues, even a facially neutral law may not withstand scrutiny if interpreted or applied in a discriminatory manner, *see id.* at 533, 113 S.Ct. 2217; *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982); *Fowler v. Rhode Island,* 345 U.S. 67, 69–70, 73 S.Ct. 526, 97 L.Ed. 828 (1953). But the intrusion caused by application of article 49 equally affects those of other faiths, as well as the recently bereaved who profess no faith at all but would still be deeply disturbed by the autopsy or disinterment of a loved one. The Tribe has presented absolutely no evidence that Chacon's decision to order an autopsy was motivated by the decedent's or her family members' adherence to the Tribe's particular religious beliefs. Rather, it was based on Chacon's perception, right or wrong, that there was insufficient evidence upon which she could determine cause of death. While the Tribe clearly believes that Chacon *should* have considered its religious beliefs in deciding whether to order an autopsy, that consideration is not constitutionally compelled. *See Montgomery v. County of Clinton,* 743 F.Supp. at 1259 n. 4.

In these circumstances, the Court must conclude that article 49, on its face and in its implementation in this case, is a facially neutral law of general application. While it substantially impacts the Tribe's first amendment right to free exercise of its religion, that impact does not rise to the level of a First Amendment violation. *See Yang v. Sturner,* 750 F.Supp. 558, 560

(D.R.I.1990) (holding that Rhode Island statute governing autopsies is a facially neutral law, despite Hmong couple's religious objection to autopsy of son); *Montgomery v. County of Clinton,* 743 F.Supp. at 1259–60 (upholding Michigan county's decision to conduct autopsy over mother's religious objection).[10] Regrettably, no other conclusion is permissible under the law and the facts of this case.

But in so holding, the Court does not wish to denigrate the legitimate concerns of the Tribe as a nation, its individual members, and particularly Ms. Elizondo, that their religious traditions be taken into account. A history of recognition of and respect for Native American burial traditions sadly does not exist in this country. Instead, the development of our nation's laws regarding the handling and burial of the dead have reflected the Anglican customs and practices imported from England, the source of our common law, and not those of other cultures. *See generally,* Jack F. Trope & Walter R. Echo-Hawk, *The Native American Graves Protection and Repatriation Act: Background and Legislative History,* 24 Ariz.St.L.J. 35, 45 (1992). These laws are often drafted to provide little or no flexibility to accommodate the diverse traditions of persons adhering to Native American, Orthodox Jew, Hmong or other religions. Yet other states have successfully drafted statutes which require consideration of the next of kin's views in determining the necessity of an autopsy. *See, e.g.,* Cal. Gov't Code § 27491.43 (West 1988); N.Y.Pub. Health Law § 4210-c (McKinney 1985). Texas, with its large and culturally diverse population, might consider enacting a similar

---

10. The Court is not persuaded by the Tribe's reliance on cases such as *Atkins v. Medical Examiner of Westchester County,* 100 Misc.2d 296, 418 N.Y.S.2d 839 (Sup.Ct.1979) (granting injunction for Orthodox Jewish family objecting to autopsy on first amendment grounds without substantive analysis), *Weberman v. Zugibe,* 90 Misc.2d 254, 394 N.Y.S.2d 371 (Sup.Ct.1977) (holding under New York law that autopsy may only be performed over religious objection upon showing of genuine

necessity), or *Wilensky v. Greco,* 74 Misc.2d 512, 344 N.Y.S.2d 77 (Sup.Ct.1973) (granting injunction for Orthodox Jewish family upon finding that autopsy not "necessary" as term was used in statute). Aside from the fact that they involve a different state statute, all were decided *before* the Supreme Court's decision in *Employment Division,* at a time when a state was required to show a compelling government interest if its law substantially burdened a religious practice.

statute. That consideration, however, is within the complete discretion of the state legislature. But absent such a statutory enactment, nothing prevents state and local authorities from acting with care and sensitivity to the wishes of family members of the deceased. In fact, a civilized society demands it.

### V. *Conclusion.*

IT IS HEREBY ORDERED THAT the request of Defendants Martha Chacon and the State of Texas for emergency relief, filed March 12, 1999, is hereby GRANTED such that the temporary restraining order issued by the 293rd Judicial District, Maverick County, Texas, is hereby VACATED; and

IT IS FURTHER ORDERED THAT judgment is granted in favor of Defendants Martha Chacon and the State of Texas on the merits of all claims brought by the Tribe in this lawsuit.