UNITED STATES of America

v.

David Paul HAMMER.

No. 4:CR–96–239.

United States District Court,
M.D. Pennsylvania.

Oct. 24, 2000.

Timothy E. Fears, Terre Haute, IN, for Vigo County, Indiana.

Frederick E. Martin, Office of the U.S. Attorney, Williamsport, for United States of America.

David A. Ruhnke, Ruhnke & Barrett, Montclaire, NJ, Ronald C. Travis, Rieders, Travis, Humphrey, Harris, Waters & Waffenschmidt, Williamsport, PA, stand–by counsel for David Paul Hammer.

## ORDER

MUIR, District Judge.

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On November 4, 1998, this court sentenced David Paul Hammer to die by lethal injection for the first degree murder of Andrew Marti. On November 12, 1998, Mr. Hammer appealed that sentence to the Court of Appeals for this circuit. By opinion of August 31, 2000, the Court of Appeals dismissed Mr. Hammer's appeal and remanded the case to this court "to fix an early new date for the implementation of the sentence of death." *United States v. Hammer*, 226 F.3d 229, 237 (3d Cir. 2000). On September 20, 2000, we received a memorandum from the government regarding the date of the execution. On September 21, 2000, we received a certified copy of the Court of Appeals' judgment in lieu of a formal mandate.

By order of September 21, 2000, we complied with the direction of the Court of Appeals by issuing an order setting November 15, 2000, as the date for the implementation of the sentence of death. Mr. Hammer is incarcerated at the United States Penitentiary, Terre Haute, Indiana ("USP–Terre Haute"), and the execution will take place at that facility. Terre Haute is located in Vigo County, Indiana.

After we issued the order on September 21, 2000, setting November 15, 2000, as the date for the implementation of the sentence of death, we received on September 21, 2000, a document from Mr. Hammer entitled "Pro Se Defendant's Response to Government's Memorandum on Setting Execution Date." In that document Mr. Hammer requests that the execution be carried out between 10:00 a.m. and 4:00 p.m. and that he be provided with 30 days' notice of the tentative time selected for conducting the execution.

By order of September 22, 2000, we directed the government to file a response

to Mr. Hammer's requests. On October 10, 2000, the government filed a memorandum regarding the setting of a particular time frame for the execution. On October 11, 2000, at 4:08 p.m., the Clerk of Court was advised by Mr. Hammer through the law office of stand-by counsel, Ronald C. Travis, that he would not be filing a reply memorandum. On October 5, 2000, Mr. Hammer filed a motion entitled "Pro Se Motion to Preclude Autopsy of David Paul Hammer" and brief in support thereof. Mr. Hammer also filed a motion for expedited briefing. By order of October 6, 2000, we authorized the government to file an expedited brief in opposition. We also authorized the Coroner of Vigo County, Indiana, to file a brief in opposition by October 18, 2000. On October 11, 2000, the government[1] filed a brief in which it argues that we do not have jurisdiction to act on Mr. Hammer's motion to preclude an autopsy. On October 16, 2000, Mr. Hammer filed a reply brief. On October 18, 2000, Assistant United States Attorney Frederick E. Martin filed a document entitled "Government's Supplemental Response to Order of October 6, 2000" and the Coroner of Vigo County, Indiana, filed a brief in opposition to Mr. Hammer's motion to preclude an autopsy. The government also filed a declaration under penalty of perjury of Harry G. Lappin, Warden of USP–Terre Haute, and Vigo County filed an affidavit of Dr. Susan S. Amos, the Coroner of Vigo County. On October 20, 2000, Mr. Hammer responded by filing reply briefs, exhibits and his own declaration under penalty of perjury relating to his sincerely held religious beliefs opposing autopsies. Therefore, both issues—whether we should set a time frame or a specific time of day for the execution to take place and whether we should preclude an autopsy—are ripe for disposition.

■ We will first respond to a footnote in the government's memorandum filed on October 10, 2000, regarding the setting of a particular time frame for the execution. That footnote states in relevant part that "the United States does not believe that this Court is the appropriate forum for considering all claims by Hammer regarding the details of his confinement or proposed execution in Indiana." We reject that position in part. This court is the appropriate forum for considering all claims of Mr. Hammer regarding the details of the scheduled execution in Indiana. It is clear also that the sentence of death must be implemented in a manner consistent with the law of the Commonwealth of Pennsylvania. 18 U.S.C. § 3596; see also H.R. Report No. 467, 103rd Cong., 2nd Sess.1994, 1994 WL 107578 (Leg.Hist.).

■ Section 3596 entitled "Implementation of a sentence of death" states in relevant part as follows:

> When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in that latter State in the manner prescribed by such law.[2]

1. Throughout this order we will use the word "government" to refer to the federal government.

2. Section 3597 entitled "Use of State Facilities" provides in relevant part as follows:
 (a) In general.—A United States marshal charged with supervising the implementation of a sentence of death may use appropriate State or local facilities for the purpose, may use the services of an appropriate State or local official or of a person such an official employs for the purpose, and shall pay the costs thereof in an amount approved by the Attorney General.

The term "imposed" throughout the federal death penalty statute relates to the adjudication by the court and not the actual infliction of the punishment. See, e.g., 18 U.S.C. § 3595(a) and (c) ("(a) Appeal.—In a case in which a sentence of death is *imposed,* the sentence shall be subject to review by the court of appeals upon appeal by the defendant. . . . (c) Decision and disposition.—(1) The court of appeals shall address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence was *imposed* under the influence of passion, prejudice, or·any other arbitrary factor . . . (2) Whenever, the court of appeals finds that—(A) the sentence of death was *imposed* under the influence of passion, prejudice, or any other arbitrary factor; . . . .")(emphasis added). Furthermore, the term "imposed" is commonly used in legal opinions with respect to the court's adjudication of punishment. In contrast with respect to the actual infliction of the punishment the federal death penalty statute uses the term "implementation." "Implement" is defined as "to give practical effect to and ensure of actual fulfillment by concrete measures." Webster's Third New International Dictionary (1961). "Implementation" is defined as "the act of implementing or the state of being implemented." Id. The implementation of the death sentence involves a process which includes more than just the method of execution utilized. Congress was no doubt aware of the usage of the terms "imposed" and "implementation" when it passed the federal death penalty statute.

■ House of Representatives Report 467 of the 103rd Congress in the section-by-section analysis of the statute states that § 3596 "provides that when a sentence of death is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise the implementation of the death sentence in the manner prescribed by the law of the State in which the sentence *was* imposed." (emphasis added). This legislative history reveals that the "is" in the statute in fact means "was."

The sentence of death was imposed on Mr. Hammer in the Commonwealth of Pennsylvania on November 4, 1998, and thus the law of Pennsylvania relating to the implementation of a death sentence applies, including the method of execution and the time of execution.

■ The government states in its memorandum that it has no objection to this court authorizing that the execution not take place before 7:00 a.m. on November 15, 2000. The government is required to comply with the federal death penalty statute.[3]

■ We will not set a time frame or a specific time of day because (1) the federal death penalty statute does not direct the court to do so, (2) the government is required to comply with the federal death penalty statute, and (3) the Court of Appeals only specified that we "fix an early new date" for the execution.

■ We will now address Mr. Hammer's motion to preclude an autopsy. The government argues that once Mr. Hammer is pronounced dead by medical personnel we have no further interest in what occurs in Indiana. The government also argues that we should transfer Mr. Hammer's request to the United States District Court for the Southern District of Indiana because of that court's greater familiarity with Indiana law and to promote consistency or uniformity in the implementation of death sentences imposed by district courts in other states. The government contends that uniformity would be promoted by hav-

---

**3.** It has come to the court's attention that the time of executions in the Commonwealth of Pennsylvania is 10:00 p.m. This conclusion is based on a review of materials received from the Federal Judicial Center and has not been verified although an attempt to do so was made by way of a Westlaw search.

ing the federal district court in Indiana decide all issues regarding the implementation of death sentences.

The states that still have death penalty statutes are not uniform in the implementation of death sentences, including the method of execution[4] and the time of execution.[5] It would be preferable to have uniformity in the implementation of federal death sentences. However, uniformity is contrary to the process which Congress devised.

During the 104th Congress, legislation was introduced to amend that process to achieve such uniformity. Specifically, Representative McCollum of Florida introduced H.R. 2359 which would have amended 18 U.S.C. § 3596 to provide that "the Attorney General will proscribe by regulation a uniform method of execution for any person sentenced to death in federal court." Congressional Testimony, Subcommittee on Crime of the House Committee on the Judiciary, September 28, 1995, 1995 WL 10731955. The Subcommittee received written testimony from Assistant Attorney General Andrew Fois regarding the proposed legislation as follows:

> H.R. 2359 would allow Federal executions to be carried out at Federal facilities pursuant to uniform Federal regulations. The Department strongly supports this proposal. This position has previously been taken by the Administration and was detailed in the June 13, 1994, letter from the Attorney General to the House and Senate Conference Committee, detailing the Administration's views on various sections of the Violent Crime Control and Law Enforcement Act of 1994 (VCCLEA).

> \* \* \* \* \* \*

> [T]he only execution for offenses under the VCCLEA[6] that could occur at Terre Haute are those for which lethal injection was permissible in the State in which the inmate was convicted.

> We believe that it is highly desirable to have a uniform system for implementing Federal death penalties in a Federal institution.

> From a policy as well as a practical perspective, it makes no sense to burden States with this clearly Federal responsibility, particularly when the Bureau of Prisons has a facility already built specifically for this task. H.R. 2359 would remedy this situation by amending 18 U.S.C. § 3596 to allow for the implementation of Federal death sentences pursuant to Federal regulations promulgated by the Attorney General. In addition, 18 U.S.C. § 3597 would, (sic) be modified to provide for the use of Federal Facilities in carrying out Federal executions.

Congressional Testimony, Subcommittee on Crime of the House Committee on the Judiciary, September 28, 1995, 1995 WL 10731957. Kathleen M. Hawk, Director of the Federal Bureau of Prisons similarly testified before the Subcommittee. Congressional Testimony, Subcommittee on Crime of the House Committee on the Judiciary, June 8, 1995, 1995 WL 352705

---

4. See Kenneth Williams, The Deregulation of the Death Penalty, 40 Santa Clara L.Rev. 677, 697 (2000)("There are five execution methods presently employed in the United States: electrocution, lethal gas, hanging, firing squad, and lethal injection.").

5. The materials received from the Federal Judicial Center reveal that the time of executions is 12:01 a.m. in Alabama, California, Illinois, Indiana, Kentucky, Missouri, Montana, Nevada, Oklahoma, Oregon, Washington and Wyoming; 12:01—3:00 a.m. in Delaware; 12:05 a.m. in Utah; 1:00 a.m. in Tennessee; 2:00 a.m. in North Carolina; 8:00 a.m. in Idaho; 10:00 a.m. in Nebraska; 3:00 p.m. in Arizona; 6:00 p.m. in Florida, Mississippi, South Carolina and Texas; 6:00 p.m.—11:59 p.m. in Louisiana; 7:00 p.m. in Georgia; 7:00 p.m.—9:00 p.m. in Arkansas; 9:00 p.m. in Virginia; and 11:00 p.m. in Maryland.

6. The federal death penalty statute was part of the Violent Crime Control and Law Enforcement Act of 1994 and is codified at 18 U.S.C. §§ 3591 through 3598.

(F.D.C.H.). The Subcommittee also heard testimony in opposition to the legislation from Marvin D. Miller, Director of the National Association of Criminal Defense Lawyers. Id., September 28, 1995, 1995 WL 10732000.

The proposed legislation died in the 104th Congress. See H.R.Rep. No. 879, 104th Cong., 2nd Sess.1997, 1997 WL. 9288 (Leg.Hist.)("On September 28, 1996, the Subcommittee held a mark-up of H.R. 2359 and ordered it reported favorably to the full Committee, amended. No further action was taken on H.R. 2359 in the 104th Congress."). On March 17, 1997, Representative McCollum introduced in the 105th Congress, 1st Session, a similar bill, H.R. 1087, which was referred to the Committee on the Judiciary. The 105th Congress, however, did not pass that bill.[7]

A death sentence is to be implemented consistent with the law of the state in which the death sentence was imposed. The government's argument regarding uniformity has no merit in light of the language of the statute and its legislative history.

The government, Vigo County and Mr. Hammer appear to have overlooked the Pennsylvania procedures for the implementation of a death sentence. See 61 P.S. §§ 3001 through 3008. Those provisions take precedence over any inconsistent regulations promulgated by the Attorney General.

 We recognize that issues relating to Mr. Hammer's conditions of confinement while awaiting the implementation of the sentence of death are not within this court's jurisdiction. However, this court imposed the sentence of death. Until that sentence is carried out and the United States Marshal files a return as required by law[8] certifying that Mr. Hammer was executed in accordance with our order and in a manner consistent with the law of the Commonwealth of Pennsylvania this court retains jurisdiction over any matter relating to the implementation of the sentence of death, including the date, time, method of execution[9] and whether an autopsy is conducted.[10]

 The implementation of Mr. Hammer's sentence of death is required to be consistent with the procedures set forth in §§ 3001 through 3008, Title 61 of the Pennsylvania Statutes, and those procedures include a section addressing whether an autopsy should be conducted. That section states that

[i]mmediately after execution, a postmortem examination[11] of the body of the

---

7. The text of that bill states in relevant part as follows: A BILL

To clarify the method of execution of Federal prisoners.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

Section 1. IMPLEMENTATION OF SENTENCE OF DEATH.

Subsection (a) of Section 3596 of title 18, United States Code, is amended to read as follows:

'(a) IN GENERAL—A person who is sentenced to death shall be committed to the custody of the Attorney General. At the time the sentence is to be carried out, it shall be implemented pursuant to regulations proscribed by the Attorney General.'

Sec. 2. USE OF FEDERAL FACILITIES.

Subsection (a) of section 3597 of title 18, United States Code, is amended to read as follows:

'(a) IN GENERAL—A United States marshal charged with supervising implementation of a sentence of death shall use the appropriate Federal facilities for this purpose.'

8. 28 C.F.R. §§ 26.2(b) and 26.4(g); 61 Pa. C.S.A. § 3006.

9. 61 Pa.C.S.A. § 3004.

10. 61 Pa.C.S.A. § 3007.

11. Webster's Third New International Dictionary (1961) defines "postmortem examination" as "an examination of the body after death usu. with such dissection as will expose the vital organs for determining the cause of death or the character and extent of changes produced by disease: autopsy."

inmate shall be made at the discretion of the coroner of the county in which the execution is performed. The coroner shall report the nature of any examination made. This report shall be annexed to and filed with the certificate required under section [3006]. After the post-mortem examination, unless claimed by a relative or relatives, the department shall be responsible for disposition of the body.

61 P.S.§ 3007. Under Pennsylvania law the decision to conduct an autopsy is at the discretion of the county coroner and absent compelling reasons that discretion should not be disturbed.

■■■ One reason to disturb that discretion is if Mr. Hammer has a sincerely held religious belief opposing autopsies.

There are religious groups which oppose autopsies. See, e.g., *Kickapoo Traditional Tribe of Texas v. Chacon*, 46 F.Supp.2d 644, 645 (W.D.Tex.1999)("The issue in this case is whether the Kickapoo Traditional Tribe of Texas (the 'Tribe') can prevent authorities of the State of Texas from disinterring the body of one of its tribe members, Ms. Norma Rodriguez, in order to conduct an autopsy to determine how she died. It brings into play the clash between the Tribe's sincerely held religious beliefs and the State's interest in assuring that the death was not the result of foul play."); *Yang v. Sturner*, 750 F.Supp. 558, 558 (D.R.I.1990)("The Yangs are Hmongs, originally from Laos, and believe that autopsies are a mutilation of the body and that as a result 'the spirit of Neng [their son] would not be free, therefore his spirit will come back and take another person in his family.'"); *Montgomery v. County of Clinton, Michigan*, 743 F.Supp. 1253, 1257–58 (W.D.Mich.1990)("[P]laintiff Joan Montgomery, who is Jewish, alleges the performance of the autopsy without her prior notice and consent infringed her First Amendment right to freely exercise her religion. She believes autopsies are offensive to the tenets of Judaism"); *Kohn v.*

*United States*, 591 F.Supp. 568, 572–73 (E.D.N.Y.1984)("Most religions in the world hold that the remains of a deceased must be treated with honor and respect. Judaism believes in the principle that body and soul are sacred because both are the handiwork of God and hence are entitled to reverence.").

■■■ In the declaration filed by him, Mr. Hammer states as follows:

> I have consistently opposed an autopsy on moral and religious grounds. These are my own personally held sincere religious beliefs based upon my reading, and understanding of the Holy Bible. Please see: 1 Corinthians 3:16–17 "Don't you know that you yourselves are God's Temple and that God's Spirit lives in you? If anyone destroys God's temple, God will destroy him; for God's Temple is sacred and you are that Temple." See also: 1 Corinthians 6:19 "Do you not know that your body is a temple of the Holy Spirit, who is in you, whom you have received from God." (New International Version of the Holy Bible).

Mr. Hammer is not required to establish that his religious belief is considered central to his religion. *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 713–14, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1980)("[T]he determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task ... [T]he resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."); *Hernandez v. C.I.R.*, 490 U.S. 680, 689, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)("It is not within the judicial ken to question the centrality of religious beliefs or practices to a faith or the validity of particular litigants' interpretation of those creeds."); *Muslim v. Frame*, 891 F.Supp. 226, 230 (E.D.Pa.1995)(Pollak, J.)("The Supreme Court has never required that a plaintiff

bringing a free exercise claim demonstrate the centrality of a religious practice or belief burdened by the government".). The basic question is whether Mr. Hammer has a sincerely held religious belief.

 The government has not contested that Mr. Hammer has a sincerely held religious belief opposing autopsies although it has had ample opportunity to do so. When an inmate has a sincerely held religious belief, before the federal government may substantially burden the exercise of that belief, it must demonstrate that the action to be taken which will infringe the religious belief is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. *In re the Grand Jury Empaneling of the Special Grand Jury,* 171 F.3d 826, 828–29 (3d Cir.1999); *Adams v. C.I.R.,* 170 F.3d 173, 175–76 (3d Cir.1999); *In re Young,* 141 F.3d 854, 860–61 (8th Cir.), cert. denied, 525 U.S. 811, 119 S.Ct. 43, 142 L.Ed.2d 34 (1998).

 Neither Vigo County nor the State of Indiana has any valid interest in conducting an autopsy on a federal inmate. The Warden of USP–Terre Haute and the United States Marshal supervising the implementation of the death sentence are the only parties who can argue that they have an interest in conducting an autopsy.

The government has made one basic argument for conducting an autopsy. It has argued that an autopsy is necessary to protect it from a lawsuit filed by Mr. Hammer's next of kin. This interest appears to be compelling. However, conducting an autopsy is not the least restrictive means of furthering that interest.

An external examination of Mr. Hammer by a medical doctor prior to and after the execution, including the taking of a series of photographs and videotaping the execution would protect the government from a lawsuit. Furthermore, Mr. Hammer has agreed to make a statement prior to the execution that he has not been physically abused by prison personnel. This statement could be taken under oath and in the presence of his stand-by attorneys.[12]

Mr. Hammer's religious belief far outweighs the government's interest in an autopsy. We will grant Mr. Hammer's motion to preclude an autopsy.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. Mr. Hammer's request that the government be directed to execute him between 10:00 a.m. and 4:00 p.m., and his request that he receive 30 days notice of the exact time of execution are denied.

2. Mr. Hammer's motion to preclude an autopsy (Doc. 715) is granted.

3. The United States Marshal charged with supervising the implementation of the death sentence shall not permit the body of Mr. Hammer to be released to the Coroner of Vigo County, Indiana, for purposes of an autopsy. The United States Marshal may permit the Coroner or other medical professional to conduct an external examination of the body, including the taking of a series of appropriate photographs. The body shall be disposed of consistent with 61 P.S. § 3007.

---

**12.** Vigo County also appears to argue that an autopsy is essential to create a legal document, the autopsy report, demonstrating that lethal injection is not cruel and unusual punishment. The federal government has not made this argument. Assuming it is a compelling governmental interest to create a body of evidence indicating that lethal injection is not cruel and unusual, an autopsy is not the least restrictive means to create that body of evidence. Toxicologists and physicians are able to testify regarding the effects on the human body of the chemical substances used in carrying out an execution by lethal injection. Furthermore, the execution could be videotaped to provide additional evidence regarding the effect on the human body of death by lethal injection.